**CORN EXCHANGE NAT. BANK & TRUST CO. v. MARYLAND CASUALTY CO.**

No. 18386.

District Court, E. D. Pennsylvania.

July 1, 1936.

Charles J. Biddle, of Philadelphia, Pa., for plaintiff.

C. Donald Swartz and Herbert A. Barton, both of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This suit at law was tried to the court without a jury.

### Findings of Fact.

Prior to November 5, 1924, one, Robert W. A. Wood, was engaged in importing Argentine wool into the United States. He financed his purchases through the plaintiff (hereafter referred to as the bank). To secure the bank for advances, the importations of wool were consigned to it. It was the importer of record and, so far as the customs authorities were concerned, was to all intents and purposes the owner.

Of the wool so imported, 169 bales were seized and libeled for forfeiture by the government for fraudulent attempt to violate the customs laws. In order to get the merchandise released (presumably at Wood's request), the bank, on November 5, 1924, gave the government its bond in the amount of $39,528 to stand in the place of the wool, the bond containing a provision that the government might enter judgment in that amount against the bank in case of forfeiture. The wool was then released and sold for Wood's account. Upon settlement, the bank retained $39,528 of Wood's money to indemnify itself against loss in case the wool should be forfeited and it should become liable on its bond.

Some months later, and while the forfeiture proceedings were pending, Wood needed the cash which the bank was holding against possible liability upon his bond. The bank was willing to let him have it provided he furnished some equivalent security and, on September 15, 1925, he gave the bank his bond with the defendant (hereinafter referred to as the Maryland Company) as surety, in the amount of $45,000, the condition being that the obligors would indemnify the bank "from and against all claims and demands of every description upon or under the above recited bond (bond of November 5, 1924, given by the bank to obtain the release of the wool) * * * and of, from and against all costs, charges, damages and expenses, including counsel fee, and legal expenses, that shall or may happen to arise in connection with any suit, action or proceeding of any kind, upon, under or in relation to said bond. * * *" This was the bond upon which this suit was brought. Upon receiving it, the bank paid over to Wood his $39,528.

The forfeiture proceedings against the wool (or the substituted bond) resulted, in the District Court, in the dismissal of the government's libel on December 4, 1930, and the government took its appeal to the Circuit Court of Appeals.

The next thing of importance that occurred was that in 1931 a fund in excess of $45,000 (the extent of the Maryland Company's obligation as surety to the bank) belonging to Wood and arising from a different though related source came, to a certain extent at least, under the control of the bank. It happened in this way: Wood had paid under protest certain duties, storage, and cartage charges

upon some 963 bales of wool (including the 169 already mentioned) and had sued to recover these excess payments. Since the bank was the importer of record of the whole shipment, the suit was brought in its name. In the early part of 1931, the Court of Customs Appeals decided this protest litigation in favor of the plaintiff, and it was determined that excess duties and charges in the amount of $99,308.85 had been illegally exacted. The Collector of the Port refused to turn this money over to Wood without the consent of the bank to which alone, as the importer of record, it was payable under the customs regulations, and required him to obtain the waiver of the bank upon a form of letter which the Collector furnished him and in which the bank stated that it had no interest in the refunds.

The bank, having the Maryland Company's bond as its security, was willing to let Wood have the money, but apparently hesitated to sign the letter without at least getting in touch with that company, which it did. However, the interchange of telephone calls and letters between it and the bank only resulted in the Maryland Company's serving notice that it would not agree to the payment of the money to Wood, but, on the contrary, intended to hold the bank for any loss which might result from the release of any collateral or security belonging to Wood which the bank might have or have control over. In spite of this the bank did, on July 25, 1931, sign the letter to the Collector and as a result of its action in this respect $55,075.86 of the money was paid to Wood. What became of the balance is not important. The bank did not get it and Wood, if he got it, did not keep it very long.

On May 4, 1932, the Circuit Court of Appeals reversed [United States v. 169 Bales Containing Wool, 56 F.(2d) 736] the judgment of the District Court in the forfeiture proceeding. The case was retried and, on December 11, 1933, judgment of forfeiture was entered, followed on the next day by entry of judgment against the plaintiff on its bond of November 5, 1925, in the amount of $39,528.

Thereafter the plaintiff endeavored to secure a modification or reduction of the judgment and in so doing necessarily and properly expended the sum of $2,190.91 in counsel fees and legal expenses, which amounts I find were fair and reasonable. Pending these proceedings, an appeal was taken in order to stave off execution on the bond until they could be concluded. The plaintiff's efforts were unsuccessful and the appeal was dropped. On September 27, 1924, the plaintiff paid the government the sum of $41,431.93, being the amount of the judgment against it in the forfeiture proceedings with legal interest thereon.

The foregoing is a statement of all the facts which in my judgment are relevant and material. However, the defendant wishes certain additional facts to appear and, that he may have the benefit of them for what they are worth, I add the following findings:

When Wood applied to the Maryland Company to act as his surety upon the bond of November 5, 1924, he made a statement of his assets and liabilities and included in the latter was an item of $39,528 which by reference is the exact amount of the liability in connection with the bond of the bank covering the 169 bales of wool released by the government after its seizure.

Between the date of the execution of the bank's original bond of September 15, 1925, to obtain the release of the wool, and July 22, 1931, when the bank signed the letter consenting to the payment to Wood by the Collector for refund of excess duties, etc., the financial condition of Wood had so materially changed that in the event that either the plaintiff or the defendant would be called upon to pay out any money on his behalf he would not have been in a position to make reimbursement to them.

The Maryland Company never received a copy of the letter to the Collector which the bank signed until January 5, 1934.

## Discussion.

It may be assumed for the purpose of this decision that, as the defendant contends, the bond of November 5, 1924, which the bank gave the government to get the wool released, created a debtor-creditor relation between Wood and itself. It may also be assumed that the bank had control of the money payable by the United States as excess duties, etc., under the judgment of the Court of Customs

Appeal and that it was in a position physically to have taken it into its possession.[1]

Even so, the general rule of law upon which the defendant relies and which is to the effect that when an obligee releases money or property of the principal coming into his hands or under his control, he releases the surety pro tanto, does not apply to this case. The reason why it does not is that the bond in this case was given for the sole, express purpose of releasing the principal's collateral in the hands of the obligee, and the clear implication from its recitals and from the nature of the entire transaction is that the bank was entirely relieved of the necessity of holding, not only the money then in hand, but any which might thereafter come into its possession. The intent was that Wood's money should no longer be impounded by the bank. The transaction was entirely for Wood's benefit, to allow him free use of his funds, and all parties undoubtedly so understood it. Suppose he had deposited the $39,528 with the bank the day after he got it. If the bank could then refuse to allow him to draw against it, the whole purpose for which the bond was given would be defeated and the transaction would have been perfectly useless. The same consideration applies to any money of his coming under the bank's control at any later period.

The bond itself recites the fact that the bank was then holding sufficient cash to fully indemnify it against loss and that the consideration for its execution and delivery to the bank was the payment to Wood of the money. The Maryland Company thus knew and agreed that, upon the strength of its bond, a fully indemnified creditor was surrendering all its collateral and was left with nothing but the naked obligation of the principal. Certainly it could not have expected or intended that the bank should immediately set about building up a new indemnity for itself out of the principal's funds—the very thing which the bond was intended to make unnecessary.

A bond given under these circumstances plainly carries with it a waiver by the surety of any right which might otherwise exist to require the obligee to hold funds of the principal later coming under its control.

Recourse to the circumstances of the parties and the purpose of the obligation may properly be had to import a waiver of this nature. In United States v. McMullen, 222 U.S. 460, 32 S.Ct. 128, 130, 56 L.Ed. 269, the court held that an anticipatory agreement by the surety consenting to extensions of time for the completion of the original contract was to be implied from the nature of that contract and from what the parties could be held

---

[1] Neither of the propositions just stated is by any means certain. I am merely assuming them as correct statements because, under the view which I take of this case, they are wholly immaterial, and the defendant may as well have the benefit of what it contends for in these respects. If I thought that the case turned on these matters, several matters would have to be carefully considered. As to the first statement, it may be pointed out that Wood was not a party to the bond of November 5, 1924, and that there is no evidence as to what his agreement with the bank was. The bond was in all probability given partly for the benefit of the bank itself, because, when the wool was sold, the latter certainly participated in the proceeds which were in part applied against Wood's drafts on the bank's letter of credit to him. After all, it seems to me a mere matter of words as to whether or not one calls the relationship between Wood and the bank that of debtor and creditor. It may have been such, but the controlling factor is the Maryland Company's agreement and understanding when it gave the surety bond September 15, 1925. As to the second, there is much to be said for the plaintiff's contention that if the money refunded had actually come into the possession of the bank, there could have been no legal defense to an action by Wood against it to recover the money. The mere existence of the relation of surety and principal does not always give the surety the right to seize any and all property of the principal which may come into its hands by virtue of independent and unrelated transactions, prior to the surety's payment of the principal debt. 50 C.J. 242. It is to be remembered that at the time the fund came under the bank's control, the bank, if it was a surety, was, from Wood's point of view, a surety who had already been fully indemnified by the bond of September 15, 1925, which had been substituted for his cash and which no doubt imposed upon him a corresponding liability to the Maryland Company.

to have contemplated, although no express consent appeared in the bond. The court said: "But the question is not what was possible, but what was contemplated as not improbable, and we are of opinion that the sureties were not discharged. There is no sacrosanct prohibition of change against them; the law has no objection to it if they assent. Whether they have done so or not is simply a question of construction and good sense, taking words and circumstances into account. If we should assume in their favor that in this case there could be no change without mutual agreement, still, in our opinion, this contract so definitely contemplated what the nature of the work made manifest, that it might be necessary or very convenient to extend the time, that the sureties must be taken to have contemplated it also as permissible against themselves."

This being so, the subsequent insolvency or financial embarrassment of the principal is immaterial. Whether or not it would give the bank additional rights as against Wood, it could impose upon it no new duties in favor of the Maryland Company. The waiver implied was an unqualified one. If the bond had been given under ordinary conditions, the rule stated in Craighead v. Swartz, 219 Pa. 149, 67 A. 1003 (cited by the defendant), might form a basis at least for a claim to release by the defendant. But no decision has been called to my attention holding that, where the surety has agreed generally that collateral need not be held, subsequent insolvency of the principal effects any change or revocation of the waiver.

### Conclusions of Law.

1. By giving the bond in suit for the express purpose of freeing collateral of the principal (Wood) held by the obligee (bank), the defendant lost any right which it might otherwise have had to defend upon the ground that the obligee failed to hold a fund belonging to the principal and subsequently coming under its control.

2. A subsequent change for the worse in the principal's financial condition, even though it may have amounted to insolvency did not reinstate any right so waived.

3. By reason of the proceedings to enforce the collection of the bond given by the plaintiff to the United States of America, under date of November 5, 1924, the plaintiff was justified in incurring and paying and was obliged to incur and pay, the costs, charges, expenses, and counsel fees set out in the findings of fact, aggregating $2,190.91. The plaintiff is entitled to recover in this proceeding the costs, charges, expenses, and counsel fees, above mentioned.

4. Under the law and the evidence in the case, the plaintiff is entitled to recover in the full amount claimed, with interest.